First calendar, Aleksanian v. Uber Technologies, 22-98. And counsel, I understand that you would like to reserve two minutes for rebuttal, is that right? Yes, your honor, thank you. Okay, please proceed. Good morning, your honors. May it please the court. Zubin Soleimani for the appellants. Rideshare drivers are directly involved in transportation across state borders. As an inseparable part of their job, they take passengers across state lines pursuant to company's policies that hold out their ability to travel as far as four hours or 100 miles. This work is dispatched to them the same as any other work, leading them to take tens of millions of trips across state lines every year. This type of work across state borders is the essence of engagement in interstate commerce. Section one of the FAA's requirement for interstate commerce is broad, and nothing in the text limits the exemption to those workers performing long distance interstate commerce. Or- Analogizing from Saxon, where it was an interstate commerce, even though Ms. Saxon never left the Chicago airport. But she was in interstate commerce because she loaded and unloaded items onto a plane, is that correct? Is that your understanding? That's correct, yes. Then why not just drive into the airport? Why doesn't that put the driver into interstate commerce? Well, so under the facts in this case, we believe that simply by the crossing of state borders alone, the class of rideshare drivers has met the standard to be engaged in interstate commerce so that they are not subject to the exemption. A forciari, if we include drivers who drive to railroads and airports, it would be a larger class, wouldn't it? Well, I think it depends on how the class is, how the class- And it would be a larger percentage. It would definitely be a larger percentage. And I think, especially given the fact that those trips are not casual or incidental, but constitute 10% of those trips and 15% of revenue, that adds further support to the argument that rideshare drivers are a class, as a class, are engaged in interstate commerce. Could you turn to that? I think you were just about to say, how would you suggest we need to define the relevant class of workers in this case? So, I think there has been some discussion about whether the class of rideshare drivers should be analyzed on a market by market basis or at a national level. I think most of the courts to address this question have looked at it as a national level. But I think that either way, the class of workers is sufficiently engaged in interstate commerce. I know- Well, and I appreciate that you may not think you need to take a position, in your view, to win. But if we were to engage in the analysis, presumably we would need to take one path or another. Which do you think is more correct? Well, I think that the notion of a class of workers engaged for the same company pursuant to general contracts makes a strong argument for the idea that the class should be national. I would note that in Saxon- Can I ask you, why would we limit it to the company? For example, again, if you reason back to the language of the statute, seamen are covered, right? Not employees of Mayor's Shipping Lines, I don't even know if that's still a company. But, or Metro North Railroad, or the category is more of an industry category. So why would it not be rideshare drivers? I don't mean to suggest that it should be limited to Uber alone. I think Judge Abrams in her decision in Islam defined the relevant class as drivers who work for rideshare companies that operate nationally, such as Uber and Lyft. So, and I think in this case, there has been much made about the notion of whether a driver's work is inherently local, and that somehow would take them outside of the ambit of interstate work. And going back to, we've been, the Supreme Court has told us in two recent cases that we should look to the contemporary meaning to understand the residual exemption. And there has simply never been a distinction between some sort of nebulous, undefined amount of long distance or local work when looking at what engagement interstate commerce is. Interstate commerce is commerce that crosses state lines, and the court in Saxon reaffirmed this when they defined, what does it mean to be engaged in interstate commerce? They said, any class of workers that's directly involved- So I understand your argument that the distance one travels to get interstate shouldn't matter. So I would imagine that if someone runs a ferry company between Manhattan and New Jersey, and that's the only thing they do is go between Jersey City and New York, that is interstate, even though they're not going very far in terms of hundreds of miles. But can you tell us, what is the threshold, in your view, of the quantity or frequency of the interstate activity that puts it over the line to be engaged in interstate commerce? So, for example, if you take an extreme example of, let's say, ride share drivers, on average, every 20th ride share driver makes one interstate trip per ten years. I would assume that, well maybe you wouldn't, but I would assume one might concede, well that's not enough to say that they're engaged in interstate commerce. So, where do we find a guide post for the frequency or quantity of interstate activity that puts you over the line? So, I think a workable principle here can be drawn from the Supreme Court's treatment of whether a carters company and the drivers working for it, driving trucks, were considered sufficiently engaged in interstate commerce in Morris versus McComb. McComb presents a workable principle that looks to whether the interstate work was a natural, integral, and inseparable part of the driver's work, and here it is. There is no way for drivers to opt out of receiving interstate work. They don't know where the trips are going. In fact, there's a whole pricing schedule for interstate work, isn't there? They can totally opt out. I thought they can opt out. They can just hit cancel. So, drivers do not know where a trip is going? Right, but when they arrive to pick up the fare, they can cancel it, right? So drivers- I just want to be precise. Absolutely. You said they can't opt out. I thought the idea was they have an incentive not to opt out. Those are two different things, right? So there's no mode by which, at the beginning, they can choose to say, I don't want to do this. Right, but once they find out, they can opt out. So once a passenger is in the car already, and they press begin trip, at that point, they can kick somebody out of their car and cancel a trip, but not without being subject to discipline. Well, wait a minute. Again, I thought that the record said that if they cancel 15 out of 100, they might be subject to discipline, right? Again, I want to be very precise about what we're saying here, as opposed to saying that when they do that, they are subject to discipline, right? There have been different standards at different times. That's correct, that the record indicates that as a standard for cancellation. However, that means that drivers who then cancel those trips every time they get them are that much closer to being subject to termination. But again, the numbers matter here, right? If we're dealing with 2% of the rides are interstate, right? Roughly, is it 2% or? I think in New York it was 3, nationally 2.72%. Okay, so call it 3. And if it's 15% of your rides that you cancel, then you might be subject to discipline, right? The law of averages, which I think we kind of have to follow here, just means that now you've eaten up three of your 15 cancellations before you could be subject to discipline. So that seems like a rather slender read. Well, I don't think that is the only way in which drivers are subject to cancellations. And the record here also includes the decisions from the Unemployment Insurance Appeal Board, which note one of the claimants being deactivated for several cancellations, not necessarily in a row, not necessarily even reaching a certain threshold. So this is part of the work that Uber wants drivers to do. They are choosing to operate in markets across state borders to provide that service. They aren't choosing to operate in New York City and combining themselves to the city limits the way the Yellow Cab Company did in Chicago. They're choosing to operate to provide that service. It's not unique to New York City. I think what New York City drivers do is typical of the country as a whole. There's not a huge difference between that 3.09% trips and 2.72% of trips nationally. You're going to do these trips as you're in the Cincinnati and Covington, Kentucky area. You're going to do them in Portland, St. Louis, Kansas City. This is part of their work. I think to the point of the level of engagement, I'd note also that these trips are significantly longer, significantly longer both in time and distance than the in-state trips. So leading- Yeah, what do we have in the record? Could you just remind us what is, is there a multiplier? Do we need to make inferences from what we know about the plaintiff's trips, about what the multiplier is between the number of trips compared to the proportion of revenue derived from the trips for when they are interstate? Right, so Uber's data in their client's declaration, I believe for in, I think I believe it's J37, J38 discusses the extent to which nationally the trips are about 2.2 times longer for mileage and in New York City about three times longer. So you're looking at, at that point you're talking about 10% of revenue and that's on the gross side. And I would view that as integral to a class of workers' operations and to a company's operations where that could be well within- So 10% of revenue because these trips are generally higher priced, is that why? By virtue of their distance in time, Uber's trips being priced by distance in time, yes. But also there is a penalty or an extra charge for going interstate, isn't there? I'm sorry, I didn't hear. Isn't there a penalty or extra charge for going interstate? The trips to, so beyond the general pricing structure, speaking for the New York, New Jersey market, yes, there's an additional $20 charge for trips crossing from New York to New Jersey. So given the fact that drivers fit within that framework of meeting that sufficient quantum from the principle set forward in Morris and Combe and no case has distinguished between relatively local interstate commerce and longer state interstate commerce, drivers should be exempt from the section one of the FAA. And given that, there's no alternative ground to compel arbitration pursuant to state law. And- Can I ask you about the state law question? Assume hypothetically, that we were to disagree with you on the FAA question. And we were to reach the state law question. Is there a material difference between New York law and the FAA with respect to at least compelling arbitration? Or would any follow on differences come? I don't know, but if there were an arbitration and someone wanted to say file a motion to vacate their defenses to enforcement. Are there material differences in real life? If the court were to say, you don't have to arbitrate under the FAA, but you do have to arbitrate under New York law. Is there a real life consequence to that? In terms of the processes for how CPLR differs from the FAA. Yeah, and a real difference doesn't matter to either party, or does it all shake out the same? If you have to be compelled to arbitrate under one or the other, does it all wind up being the same? I think the FAA was largely modeled after New York State's Arbitration Act when it was drafted. And I'm not aware of any significant differences in how that plays out. I think the difference was significant enough for Uber, though, to want to choose the FAA three times over its contract to be explicit about that's what Uber wanted. And Uber did not need to insert that choice of FAA language into this contract in order for the FAA to presumptively apply. As nobody questions that this is a contract involving commerce, therefore, the FAA would have applied even if Uber was silent as to choice of law. If Uber had written that contract and drivers were exempt from the FAA, then absolutely, there would be a blank slate upon which to perform choice of law analysis. But they didn't. They could have drafted the contract they did a month after this case was initially filed in the district court that chose to reserve the state law as the law governing arbitration if the FAA didn't apply. They didn't. They chose the FAA explicitly and only the FAA. And the court in New Prime said we have to look at contracts based on the terms as written. And here, the terms as written compel arbitration solely under the FAA. And the result there is a court lacks the power to compel arbitration under section four if drivers are exempt from the FAA. All right, I think we understand that you've reserved two minutes for rebuttal. So why don't we hear from your adversary? Thank you so much, your honors. Counsel. May it please the court. My name is Adam Yankowski. I represent the appellees in this case. The district court correctly concluded that plaintiffs do not fall within a class of workers that is engaged in interstate commerce within the meaning of section one of the Federal Arbitration Act. In Southwest Airlines versus Saxon, the Supreme Court instructed that the section one inquiry turns on the type of work the members of the class as a whole typically carry out. And it cannot be said that the members of the class of ride share drivers as a whole typically engage in interstate commerce. So to be with both parts of that, as a whole and typically, many drivers who don't live near state lines will not cross state lines at any time in their entire lives. Many American cities, Los Angeles, San Francisco, Miami, many others are nowhere near a state line. And the typical Uber driver in those cities will never have occasion to cross state lines at any time in their lives. The record shows, for instance, that 99.99% of rides in California do not cross state lines. And I don't think- But what percentage go to airports? So I'm happy to talk about the alternative argument about airports. We think that the plaintiff's argument is really foreclosed by the Yellow Cab case. I actually think the discussion in Yellow Cab could have been written for this case. So if I could just read you what the Supreme Court said with respect to the Sherman Act. The court said, excuse me, the taxi cabs in that case relationship to interstate commerce was only casual and incidental. When local taxi cabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation. The interstate trip begins when the passenger boards the train at the station and ends when he disembarks at the station in the city of destination. So the Supreme Court emphasized that the cab fares were not paid or collected as part of the railroad fares. To the taxi driver, it's not just another local fare. So Uber, we're not saying that Uber is a taxi company, but the logical implication of plaintiff's argument is that taxi companies also would be considered engaged in interstate commerce. Because of course, taxi cab drivers also drive to and from the airport. We think this reasoning is pretty much dispositive in this case. The mere fact that sometimes drivers take someone to the airport as just part of any local trip does not establish that drivers engage in interstate commerce in the same manner as- Counsel, so I'm sorry to interrupt you in the middle of a word. But wasn't Ms. Saxon held to be in interstate commerce because she loaded and unloaded packages onto a plane? She never left the airport. You're absolutely correct in the holding of the Saxon case. We're not arguing that one has to cross state lines in order to be- Correct. So that's clearly- But she was working with planes that were interstate commerce, right? That's correct. What's the difference between what she did and what an Uber driver does who takes someone to LaGuardia Airport? Okay, I think there's a difference between loading the bags on the plane and- And loading a person? No, and taking the person from their destination to any destination they want, including if they happen to want to go to the airport, the airport. Like the Southwest case emphasized that the definition of commerce included warfare agreements, which are specifically agreements to load cargo onto ships. And so the core reason that, okay, if loading cargo onto a ship is interstate commerce, so is loading cargo onto the airplane. But someone who spends all day every day loading bags onto airplanes, I think is not the same as someone who will take someone anywhere they want in the city. And if they happen to want to go to the airport, they'll take them to the airport. I think that's far more analogous to what's going on in the Yellow Cab case. Go on. And so I also think- Yes. Let me back you up to where I think you were going as a whole and typicality, and I'd like to hear you on both of those. What do we do with the averages? It sounds to me like there's information in the record suggesting that somewhere between 2 to 3% of all Uber rides in the country are interstate, right? And then you told us, well, in California, it's 99 point whatever percent are intrastate. Well, presumably, you must have some dramatically higher percentage in other states that are offsetting it. How do we evaluate this as a class? Obviously, there are going to be variations, just as there would be variations, I would think, with railroad workers, which I know are defined as railroad workers, not railroad workers engaged in interstate commerce. But I would think that all railroad workers who work for the LIRR don't ever cross state lines, but obviously, they are railroad workers. How does that play out, then? Do we not look, I mean, maybe it's a question of defining the level of the class, and I should ask you that. If you think it should be a nationwide class, why are we not looking at averages? Why are we looking at a market, like you say, Connecticut, California, that has nobody crossing state lines? because then don't we just get into arguments about which market we're supposed to look at? Yeah, so let me explain why I mentioned California and then talk about the nationwide average. So I think it should be a nationwide class. That is our position. Okay, the reason I raised the California example is because when you talk about a class as a whole, when you have lots and lots of people in the class who will never do something, I think it's hard to say that the class as a whole does that thing. Here, only people who just happen to live near state lines will ever actually cross them. But lots and lots of people don't live near state lines, and I don't think you can say it's characteristic of the class. You wouldn't say that the class of federal district judges sit in New York, when only New York judges and- Some of us get dragged here all the time. Some of us cross state lines on a daily basis. No, I understand. But I'm happy to just talk about nationwide statistics. It's a condition of employment. I understand, Your Honor. But, you know, just talking, I'm happy to just talk about the nationwide averages. It's still in the, like, 97, 98 percent range. And I think that the pertinent comparison is to seamen and railroad employees. Like, the archetypal seaman and railroad employee is someone who just, like, does interstate commerce for a living. Like, seamen exist, right? I mean, I guess, do we know that? I mean, or are we just assuming that to be true, because we have notions of how seamen work? I mean, I don't know. Was that true in the 20s, or was, you know, before the construction of the interstate highway system, where people, you know, if they're trying to get ships, people get from, you know, New York, I don't know, up to Hudson. You know, there were all these longshoremen, you know, loading boats. I don't know, and I guess I'm hesitant to start making assumptions about how many seamen were truly acting interstate and how many of them were engaged in intrastate. Well, you know, let me give two answers to that, okay? First of all, there are some statistics in the record suggesting, for instance, that the vast majority of railway revenue at the relevant time was freight railroad, which would have traveled hundreds of miles. Similarly, for seamen, most ships were commercial ships that wouldn't likely have transported people from one place to another. So I think the available statistics in the record suggest that the bulk of maritime and railroad transportation were, like, long-distance interstate travel. But if I could just make one other—I'm sorry, Your Honor, did you have a question? No, go on. Okay, if I could just make one other question. I actually—I mean, I don't think it's plausible that Congress would have—I think this is a very oblique and misleading way. If Congress had really wanted taxi cabs to be covered by Section 1, I think writing the statute in this way would have been a very oblique way to do it. So again, the logical implication—we're not saying that rideshare drivers are taxi drivers. We're just saying the logical implication of plaintiffs' position is that taxi drivers also are engaged in interstate commerce. I can't imagine Congress would have written the statute this way if that's what they wanted. Well, but, counsel, when the statute was written on the first of plaintiffs' theories, the actual interstate travel, taxi drivers weren't really engaged in interstate commerce, right? Travel was very different. People—you know, now you commute—suburbs are 100 miles away, right? Back then you commuted 2 miles to work. Now you commute 100 miles to work. Everything has changed. But the statute—you know, Saxon required an analysis of these categories and similarity to seamen and railroad employees. As to interstate commerce, the statute just says engaged in. It doesn't say substantially engaged in. It doesn't say predominantly engaged in. It says engaged in. And so why do we not sort of focus on the plain language of the statute there? Why do we go far afield where we needed to with the question of what constitutes a transportation worker, maybe? Why do we need to do that on the question of foreign or interstate commerce? Okay, so let me answer both parts of your question, Your Honor. So your first question was about, you know, local transportation having changed. I mean, the average ride on Uber is something like 6 miles. I'm not sure it would have been that much less in the 20s. You know, I mean, New York City was right next to New Jersey at the time. I mean, too, it wouldn't surprise me if taxi drivers would go to New Jersey and New York and back at the time as well. We're talking about very short distances even today for Uber. Second of all, we're not trying to diverge from the statutory text. We think we're following the statutory text. Because when you talk, I just think when you talk about a class of people engaging in something, that doesn't mean like a small percentage of the class does very rarely. It's like the job description. Then we'll ask you the question that Judge Nardini asked your opponent after you circle back, which is what is the threshold then? If it's not a small percentage, does it have to be 50% plus one? So I think in terms of the number of people in the class, it's got to be most, yeah. I think it's got to be at least the majority. Because I don't think you can say a class of people do something if, you know, a minority of people within the class do it. When you say a class of people doing something, it's got to be characteristic of a class. I think at least most of them have to do it just if you want to say the class does it. And even for individual people in terms of like the percentage of their day, I think you have to just look at the archetypal seaman and railway employee. Like, look, many at least, a substantial number, when you think about a seaman or a railroad employee, like engaging interstate commerce is what they do for a living, right? Like, you know, someone's on a freight train. That's their job, facilitating interstate commerce. Maybe that's also true for someone who loads bags onto an airplane. There's really no drivers at all, like zero, who use the Uber app to find passengers who can say their job is engaging in interstate commerce. At most, even the drivers who live right next to a state line will cross state lines like once a week or something like that. Quite unusual. Most of their rides are just within New York City. Once a week, then the strike is particularly an unusual thing. Well, but that's only for the narrow category of people who just happen to live in New York City. But if 2% of all rides in the country, or whatever, 2 point something percent are crossing state lines, I guess it, I mean, one of the questions, I guess, let me back up. You're suggesting that it needs to be a majority of members of the class who have to be engaged in interstate commerce? Did I hear you right? I think that's right, yeah. So is one of the implications of your suggestion that the averages are meaningless? No, I don't think. Because I think what you're saying is that we need to know not what is the average, you know, 2%, if that number of rides happens to be concentrated in a particular group of people, averages, shmaverages, right? That you're saying we have to total up the number of Uber drivers and then ask whether 50% plus a peppercorn of them are driving across state lines, and then you have to ask at what frequency? No, so, yeah, there's two questions. Okay, so in the Southwest Airlines versus Saxon case, the Supreme Court said you have to look at what the class as a whole typically does. So there's two things there, as a whole and typically. But the question is, and the question of the quantitative amount of engagement in the conduct that they found was, in fact, interstate commerce, that was taken, that was uncontroverted, right? I think they started by saying, look, it's uncontroverted that these ramp supervisors frequently are loading and unloading baggage. So the quantum was not an issue in Saxon, and that's why we're stuck without any guidance from the Supreme Court about what the quantum is, although your opponent would suggest in the Morris case we are getting some guidance. So what is the quantum? Because I don't see that coming from Saxon. Where do we get the quantum? So, I mean, it's hard to, I mean, there's no specific number in Saxon. So I'm just trying to infer from Saxon as well as the... So what's the standard that you instill, and from where do you get the standard? I think that the best way to do it is to get it from seamen and railway employees. That's the best I can do in terms of this, and see whether they're, you know, relevantly similar to those employees. Again, when I think of the archetypal seaman, it's someone who does interstate commerce for a living, and same for a railway employee, right? Their job, all the time, all day, is to be on the train or the boat. Not all of them. Not all of them. But in the case of Uber, it's none of them, right? I don't think that there's a single driver anywhere in the country that their job, what they do for a living, all day, every day, is facilitating interstate commerce in the same way as a freight train employee or someone who works on a ship, okay? So I just think it's... I understand exact lines are hard to draw, and, you know, Southwest doesn't answer the question, but I think it's just qualitatively very, very different. And I do think, in terms of the 50%, I just don't think you can say a class of people do something if only a small number of them do it. Or, more pertinently in this case, only people who by happenstance live near a state line would ever do it in their entire lives. And so if only a subset of a class, by happenstance, do something depending on where they live, I just don't think you can say the entire class engages in that activity. But if it's only 2% nationwide, that includes all the people who don't live near state lines at all. So some of the members of the class must do a lot of interstate commerce, correct? Well, I mean... Well, this is in the record about New York. I think it's either 96 point something percent or 98 point something percent, depending on whether you're looking at the 2013 to 17 range or 2019 range. There's a declaration in the record giving exact statistics for New York. Like, I think even if you stay focused only on New York, which we don't think is the relevant class, it's still, you know, the archetypal driver in New York spends a minuscule amount of his or her time driving people across state lines. Quite in contrast- Can I also ask, and this is a question of measure, and perhaps for your argument it doesn't matter, because no matter how you measure it, under your view, you fall below the threshold. But as, you know, we talk a lot about the number of rides. But considering that this is a question of engaging commerce, and commerce is all about making money, would the more relevant figures be the revenue that's derived from it? So if, for example, the interstate rides tend to be longer and therefore tend to be more lucrative, bringing more gross revenue, is that the more useful measure? Now, I understand that in your view that's still far below whatever threshold, but in your view, which is the more relevant measure? The number of rides, or is it the time spent in the car? Is it the revenue, which I assume is correlated more closely? Or is it a better measure? Well, I don't think it's the revenue. I mean, the Southwest case instructs to look at the work that is done. So, you know, there's an argument that- Because we're talking about workers. Yeah, workers. So I don't think it's the amount of money that's made. It's the work being done. So is that mileage, time in the car? Yeah, I think mileage might be relevant, yes. So that may be relevant consideration. But even if you consider mileage or revenue, and there are statistics in the record about revenue, I still think it's- Right, no, I understand your thought, that even your threshold, you're way below whatever the threshold is. Yes. Can I ask you- Oh, did you have a question? I just had a question, I think, that comes off of that, which is about the national impact of the ride share industry, right? And I think it's Uber alone, right? It's 35 million interstate trips in 2019. And in your briefing, you sort of say, yeah, don't you worry about that. But why wouldn't we? Because when we're talking about being engaged in interstate commerce, in most areas of law, we're thinking about the impact, the effect this industry or this activity has on interstate commerce. And by now, ride share programs clearly have a dramatic effect on interstate commerce if they're making that many trips. It's spread across, in part because of the side gig sort of model that a lot of these ride share drivers are working in, it's spread over a very large number of drivers. So each driver may be doing a few trips. But isn't the impact on interstate commerce and travel really significant of ride share? So, I mean, I can't dispute that the aggregate impact of all of Uber's activities has an impact taken together on interstate commerce. I just don't think that's what the statute says. I think it focuses on what the class of workers is engaged in. I think it'd be quite unusual if, you know, if this older, smaller version of Uber, drivers weren't engaged in interstate commerce, but then they transformed to being engaged in interstate commerce merely because there was more of them. So Uber as a company impacts interstate commerce, but its drivers as a class are not engaged in interstate commerce. No, it involved, but in the Circuit City case... Well, they're involved in, but not engaged in. The workers are not, the class of workers are not engaged. And, you know, involved versus engaged, that's a line the Supreme Court drew in Circuit City. I'm not making that up, Your Honor. I understand. I was asking you that, that you're saying that you agree they're involved in, but you don't agree they're engaged in. I agree they're involved in, or else the FAA wouldn't apply at all. But I don't think that the work class of workers is engaged in, in the sense relevant. I don't think just simply increasing the number of drivers transforms the nature of what all of those drivers does from interstate to interstate, which is the logical implication of the argument that you should just take the aggregate number of rides. I have a question. Counsel, can I take it to mean when you don't cite us a case that no circuit or Supreme Court case has said that all the workers have to be involved all the time in interstate commerce? There's no case that says that. Isn't that correct? That's correct. It's not our position. And you're right, no case has said that, and that's not what I'm telling the court today. I thought you said they have to be involved in interstate commerce all the time by doing their job. Well, you said most, not... I didn't say all the workers, and I didn't say all the time, Your Honor. That's not our position. Restate your standard so I can understand it. Okay, so it has to be the class as a whole. So I think that's got to be at least most, not all. And by most you mean 50% or more. That's right. And then I think typically it's got to be like... So the standard from the Seventh Circuit's Wallace case, which the district court cited in this case, is a central part of their job description. So I think for at least most, a central part of their job description has got to be engaging interstate commerce, which is exactly what it is. Where does that come from? What's that? The central part of the job description. Well, I think it's... I understand that that sounds nice. Yeah. That could easily be a standard that could be enshrined in statute. We would have to interpret it. But where does that come from? I think that is what I think of when I talk about a seaman and a railway employee, what they do for a living. Clearly the central part of the job description of the archetypal seaman who's on a ship, engaging in foreign commerce, that person just does engage in foreign commerce for a living. So it's by analogy to the other enumerated categories in the statute. That's right. That's where we get from. Can I ask you... No, but no case. I want to stress, no case has said that. Well, I mean, the Capriol case from the Ninth Circuit and the Cunningham case from the First Circuit come out exactly the way we're advocating today. And there's several district court cases. There's the Osvattic case from the DDC, which has extensive reasoning. So this is not a... Our argument is consistent with numerous cases involving Uber and Lyft. So I don't think that we're stretching the law in this case. Can I ask you about the question of the governing law with respect to arbitration? The FAA in New York, I asked opposing counsel this. Does there wind up being any material difference if hypothetically our court were to say, you know what, the FAA does not apply, but New York law does apply and you should compel arbitration. If that's the way it went, I'm thinking of some of the other cases in the district courts that have wound up at that place. Does it have any actual consequences in the real world? Are there material differences between the two governing legal structures for arbitration? I don't think so, Your Honor. In this case, I'd say no. I mean, of course, we want the FAA to apply because all 50 states, right, we're thinking about. But in this case, I don't think so. I think that the argument is only relevant if you accept plaintiff's argument that the whole arbitration clause goes away if the FAA doesn't apply. And if for some reason, again, hypothetically, we would get to the point where, let's say we said the FAA does not apply here, I'd take it it's your view that you would want us to reach the question of whether New York law applied and to say ourselves, I guess it's a matter of law, we can tell on the record New York law applies and therefore, I guess affirm on other grounds apparent in the record. Is that a fair characterization? Yes, Your Honor. I mean, we'd like the ultimate disposition to be to affirm and if the court disagrees with us on the FAA, we would like the court to do that. No other questions. Okay, thank you very much. Why don't we hear from Mr. Suleimani? Mr. Suleimani, you have two minutes and I know, I appreciate we've kept you both up considerably but passed your time. I appreciate that but we'll try to keep it as a two-minute rebuttal. Great, thank you. So I believe counsel's contention that the FAA requires transportation workers to seem like an archetypical seaman or railroad worker from the 1920s is a stretch too far. The Supreme Court has said in Mayor of Baltimore in 2021, statutory exemptions don't get a narrow reading. They get a fair reading like the text of any other statute. So here, Circuit City did the narrowing and said that the scope of it is transportation workers. Well, we may talk about how much these folks resemble transportation workers from the 20s, this idea of an archetype is taking that double or triple narrowing step I think too far. As to the question of workers in the class, I think both the First Circuit in Cunningham and Judge Nathan in her Heider decision noted that it's also true of the enumerated categories that not all workers necessary in railroad work and maritime work do interstate work. I think that resolves the question for us here. When we look at folks like the workers in Hubbard, the Supreme Court found that we're not looking for any sort of essential long distance work, but where there's a 16 mile long interurban railroad and only a fraction of the route went into another state that was still sufficient for the federal commerce power. As regards to the state law question, I think the problem with trying to apply New York law if the FAA doesn't apply is that that would require a papering over of an extant choice of law provision in the contract that cannot be severed. There's no basis on policy grounds to sever that and there's no basis in the contract to sever it. Uber's severability clause that it points to in this contract calls for a replacement which would be a rewriting of the contract under the, rather than interpretation. And this court is bound to enforce the terms of the contract as written. Thank you, Your Honor. Thank you very much. Very well argued on both sides. We very much appreciate your oral arguments today, but we'll take the case under advisement. Thank you, Your Honor.